UNITED STATES of America, Appellee,

v.

Peter JODOIN, Defendant, Appellant.

No. 81–1293.

United States Court of Appeals,
First Circuit.

Argued Nov. 6, 1981.

Decided March 8, 1982.

John C. McBride, Everett, Mass., with whom Michael F. Natola, Everett, Mass., was on brief, for appellant.

Charles T. Spurlock, Asst. U. S. Atty., Cambridge, Mass., with whom Edward F.

Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, DAVIS,* Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

After jury trial in the Massachusetts federal district court, appellant Peter Jodoin was convicted of unlawfully possessing cocaine with intent to distribute it. 21 U.S.C. § 841(a)(1).[1] On this appeal he attacks the admissibility into evidence of cocaine seized from a suitcase he carried; he argues that his trial was held after the Speedy Trial Act's time limit had expired; and he asserts that certain jury instructions were improper. We reject these claims and affirm his conviction.

I

Appellant's "search and seizure" arguments are based upon the activities of Drug Enforcement Administration ("DEA") agents at Logan Airport in Boston. After Jodoin arrived in Boston from Florida, these agents talked to him, detained the suitcase he was carrying, and then (after obtaining a search warrant) opened and searched the suitcase, finding cocaine. The trial court held an evidentiary hearing upon Jodoin's motion to suppress this evidence. Its findings, well supported in the record, describe what occurred:

Late in the afternoon of August 7, 1980, two narcotics detail undercover agents, working for the Broward County, Florida Sheriffs' Department, saw Jodoin get out of a taxi at the Delta Air Lines terminal at Fort Lauderdale-Hollywood International Airport. He was carrying a large white suitcase and a small grey plastic bag. He kept turning his head to look at the agents while he moved hurriedly to the counter, checked his white suitcase and then ran towards the gate area where flight 326 to Boston was just leaving. He appeared nervous while in the terminal, continually turning his head to observe the agents even while he was running towards the gate.[2]

This behavior aroused the agents' suspicions. Consequently, after Jodoin left, they asked the airline counter personnel for the history of appellant's ticket. They learned that it had been paid for in cash, was issued to "Paul Harper" and showed the appellant had arrived in Fort Lauderdale from Boston at 1:00 in the morning that same day. His return flight was open. The ticket purchaser had not given Delta Air Lines a telephone number at which he could be reached. The agents questioned the taxi driver and found that the appellant had picked up the taxi in front of the Howard Johnson's Hotel at Fort Lauderdale beach. They phoned the hotel and learned that no one registered under the name "Harper" had been staying there. On the basis of this information, the agents suspected that appellant was a drug courier, for his behavior matched several of the characteristics contained in the "drug courier profile" for the Fort Lauderdale airport. *Cf. United States v. Mendenhall*, 446 U.S. 544, 547 n.1, 100 S.Ct. 1870, 1873 n.1, 64 L.Ed.2d 497 (1980). They therefore telephoned the Boston office of the DEA and described these facts to agent Roger Marchand.

Marchand and two other DEA agents went to the Delta Air Lines terminal at Logan Airort to await the arrival of flight 326 from Fort Lauderdale. Appellant arrived at approximately 8:45 p.m. He walked to the baggage carrousel, waited for his luggage, picked up a white suitcase and began to leave the area. The DEA agents testified that throughout he looked nervous. While walking through the halls of the airport, he stopped on three occasions and

---

* Of the United States Court of Claims, sitting by designation.

1. (a) Except as authorized by this subchapter it shall be unlawful for any person knowingly or intentionally—

   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

*See* 21 U.S.C. § 812, Schedule II(a)(4).

2. Jodoin established below that agent Callahan seemed to be a "blond, young looking woman ... [not] unusual for men to look at." But it turned out that Mr. Jodoin "looked equally" at agent Callahan and at Sargeant Riggio, her male partner.

"scanned the area, completely turning his head all the way around." In the baggage claim area "he was looking all about the area."

When Jodoin left the baggage claim area, the agents approached him. Marchand identified himself as a DEA agent and asked Jodoin whether he could speak to him for a minute. Jodoin answered, "sure." Marchand asked him for his name, identification and where he was traveling from. Jodoin said his name was "Peter Jodoin" (not Paul Harper). He said he was returning from Fort Lauderdale where he had stayed with friends for a few days (not 17 hours). He added that he had left his clothing in Florida (although he carried a suitcase). He told the agents he had no identification and that he had thrown his ticket away. When agent Marchand asked him whether the suitcase he was carrying was his, he replied, "I don't know." He then said it was not his. The agents stated that Mr. Jodoin was nervous and that "perspiration began to form above his upper lip."

After refusing to allow the agents to search the suitcase, Jodoin picked it up and went outside the terminal toward the cab stand. The agents followed him. Jodoin asked whether he was under arrest. Marchand replied that he was definitely not under arrest. But he asked Jodoin if he would continue the conversation at the airport DEA office. Again, Jodoin replied, "sure." Marchand added that there was a telephone available at the DEA office if Jodoin wished to call his attorney.

At the DEA office, the agents told Jodoin they wished to have a trained narcotics detecting dog sniff the suitcase. The dogs were not immediately available. Jodoin was free to leave. He waited about 20 minutes and then left. The agents kept the suitcase. The next day, August 8, a detector dog sniffed the suitcase but the dog did not signal the presence of narcotics. On August 11, the DEA obtained a warrant to search the suitcase—on the basis of the information set forth above, along with an agent's statement that an informant had told a different agent that appellant had

associated with known drug dealers. The search of the suitcase revealed four clear plastic bags containing several pounds of cocaine. Jodoin was subsequently arrested.

■ Jodoin claims that the DEA agents acted unconstitutionally in stopping and questioning him at Logan Airport, in detaining his suitcase, and in obtaining a search warrant. We reject these claims for several reasons. For one thing, the Supreme Court has held that a person is "seized" in constitutional terms "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained [his] liberty" so that he is not free "to walk away." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16, 88 S.Ct. 1868, 1877, 1879 n.16, 20 L.Ed.2d 889 (1968). The trial court here expressly found that "the defendant's liberty was not restrained" and his counsel conceded at oral argument that "the facts would support ... a voluntary, intelligent and knowing decision on his part ... to accompany the drug enforcement agents back to the DEA office." The record adequately supports the trial court's finding. *See United States v. Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1878–79; *United States v. West*, 651 F.2d 71, 72–74 (1st Cir. 1981), *petition for cert. filed*, 50 U.S.L.W. 3132 (U.S. Aug. 14, 1981) (No. 81–307); *United States v. Viegas*, 639 F.2d 42, 44–45 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981).

For another thing, even if this brief investigatory stop amounted to some restriction on liberty, that stop was "justified by some objective manifestation" yielding "a particularized suspicion" about the involvement of the individual in illegal activity. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980). Jodoin's brief 17-hour stay in Fort Lauderdale, a source city for narcotics; the fact that his plane ticket was paid for in cash; that he gave no telephone number to Delta Air Lines; that he appeared nervous, looking about the Fort Lauderdale, as well as the Boston, airports; and that all these facts fit within a "drug courier profile"

developed by expert enforcement agencies as a means of identifying potential couriers,[3] would seem more than sufficient to justify the DEA agents in Boston simply *approaching* Jodoin. His answers to their questions justified further questioning. They revealed, for example, that he used a false name, that he lied about the length of time he stayed in Florida, that he was carrying a suitcase that he said was not his, that he claimed not to know to whom the suitcase belonged, that he said he had no clothing with him, and that he possessed no identification or airline ticket.

These facts, under the relevant case law, are sufficient to meet the standard for a "brief investigatory stop" laid down in *United States v. Cortez, supra.* They also justified detention of the suitcase for, by providing independent corroboration (Jodoin's ticket history) and by revealing significant false statements, they make out a stronger justification for the agents' notion that the luggage was an instrumentality of crime than did the facts in *United States v. West, supra* and *United States v. Viegas, supra*—two cases in which this court has upheld similar detentions.

Indeed, the facts within the DEA agents' personal knowledge, in our view, were sufficient to warrant a reasonable *belief* that the suitcase contained drugs or other instrumentalities of crime. *Cf. Dunaway v. New York,* 442 U.S. 200, 208 n.9, 99 S.Ct. 2248, 2254 n.9, 60 L.Ed.2d 824 (1979). Jodoin had told two highly relevant lies about himself: 1) he told the agents in Boston that his name was Jodoin, but in Florida he gave his name as Harper; 2) he told the agents in Boston that he had been in Florida for several days, but his ticket revealed he was in Florida for 17 hours. Jodoin also made a series of statements about the suitcase that the agents knew were false or, at the least, most unusual: 1) he said the suitcase was not his; 2) he said he did not

know to whom the suitcase belonged; and 3) he said that the suitcase did not contain his clothes, which he had left with friends in Florida.

These direct lies and peculiar statements must be taken together with nervous behavior, a brief 17-hour Florida stay, cash ticket payments, midnight plane rides, no phone number and other behavior which fit the Fort Lauderdale drug courier profile. These facts must also "be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene ... guided by his experience and training." *United States v. Davis,* 458 F.2d 819, 821 (D.C.Cir. 1972). *See also* Ringel, *Searches & Seizures, Arrests & Confessions* § 4.2(b) at 4–12–13 (1980). So viewed, we believe they warrant the finding of probable cause to detain the suitcase under the standard set forth in *Dunaway v. New York,* 442 U.S. at 208 n.9, 99 S.Ct. at 2254 n.9 and *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Because these facts satisfy the higher standard of *"belief,"* we need not consider whether because of the *length of time* of the detention of the suitcase, it would have been unlawful if supported only by *"reasonable suspicion"*—an issue which, while not specifically raised here, has bothered the courts of appeals for other circuits. *See, e.g., United States v. Place,* 660 F.2d 44, 50–53 (2d Cir. 1981) *cert. denied,* —— U.S. ——, 102 S.Ct. 2905, —— L.Ed.2d —— (1982) (two hours of investigative holding of a suitcase unreasonable if based exclusively on reasonable suspicion and not probable cause); *United States v. Martell,* 654 F.2d 1356, 1360 (9th Cir. 1981), *petition for cert. filed,* 50 U.S.L.W. 3803 (U.S. March 15, 1982) (No. 81–1772) (*quaere* whether there is an outer time limit for the detention of "impersonal objects").

We also believe that these facts as set forth in a DEA agent's affidavit warrant

---

**3.** Agent Marchand, who was in charge of the case at the airport, had worked 10 years for the DEA and 10 months with the airport detail. One of his partners there, agent Keaney, had worked 10½ years for the DEA. *Cf. United States v. Ortiz,* 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975); *United States v.*

*Brignoni-Ponce,* 442 U.S. 873, 885, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975). The record suggests professional detection activity by professional agents, not random passenger checks or arbitrary use of the courier profile. *Cf. Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

the magistrate's later decision to issue a search warrant. Although a drug detecting dog did not react when it sniffed the suitcase, the agents pointed out that, according to dog handlers, "the dogs are not foolproof," they "are less accurate on hot muggy days," and drug traffickers have found ways "to mask the odors of contraband to fool detection efforts." The dog's failure to react does not, in our view, destroy the "probable cause" that would otherwise exist. It is just another element to be considered by the magistrate. *See generally United States v. Place*, 660 F.2d at 42 (the dog sniffing established "probable cause" over a previous "reasonable suspicion"); *United States v. Bronstein*, 521 F.2d 459, 463 (2d Cir.), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976) (dogs' failure to alert might "preclude" a search or arrest absent other probable cause grounds); *United States v. Race*, 529 F.2d 12, 14 (1st Cir. 1975) (it is not *any* excited behavior of a dog that is sufficient by itself to establish the presence of contraband); *United States v. Sullivan*, 625 F.2d 9, 11–13 (4th Cir.), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1374, 67 L.Ed.2d 352 (1981) (failure to alert, but "an interest" towards a bag sufficient, when coupled with other circumstances, to support a search warrant). *See also United States v. Chase*, 503 F.2d 571, 576 (9th Cir.) (Williams, D. J., dissenting), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975). Both a federal magistrate and a district court judge believed that the affidavit—read in a common sense manner, *see United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) —makes out probable cause for the search. And, so do we.[4]  *See Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *United States v. Timpani*, 665 F.2d 1, 4 (1st Cir. 1981).

## II

Appellant claims that the district court erred when it refused to dismiss the case against him for lack of compliance with the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* That act requires that a trial "shall commence within 70 days" from the time of indictment or arraignment, whichever is later, 18 U.S.C. § 3161(c)(1). *See United States v. Cordero*, 668 F.2d 32, 45 (1st Cir. 1981). Otherwise, "the information or indictment shall be dismissed on motion of the defendant." 18 U.S.C. § 3162(2). The 70-day period can be extended, however, by certain "periods of delay" which are specifically excluded from the "day-count." In this case, appellant was arraigned on August 25, 1980 and his trial began on March 31, 1981, 218 days later. The district court specifically excluded 132 days and the parties agree that this exclusion was proper. Appellant claims that there were, however, "86 unexcluded days between arraignment and trial"—16 more than the statute would allow.

On March 18, 1981, appellant moved to dismiss the case on Speedy Trial Act grounds. The trial judge, after hearing on March 24, denied the motion. The judge recognized that under the terms of § 3161(h)(8), he is authorized "on his own motion" to exclude additional days by granting a "continuance on the basis of his findings that the ends of justice ... outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8).[5]  The judge believed that

---

**4.** We do not reach appellant's claim that the affidavit did not say enough to support the credibility of a "reliable informer" who claimed Jodoin associated with drug traffickers, because, as the district court found, the affidavit makes out probable cause without the "reliable informant's" information.

**5.** 18 U.S.C. § 3161(h)(8) excludes from the "day-count":

(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial....

(B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to

much of the delay had been caused by the appellant's attorney who had repeatedly told the court clerk that a murder trial and other trials he was conducting in state court made it difficult for him to try this federal case. The attorney himself apparently conceded that some of this time should be excluded, for he spoke of his "gracious concession of 12 days or even 14 days" when he was "actually unavailable by being on trial in . . . a murder case . . . in Middlesex Superior Court."[6] Consequently, the judge denied the motion to dismiss on speedy trial grounds. He also granted a week's additional continuance, setting the trial for March 31. Appellant's counsel, after losing his motion for dismissal, did not object to this additional week.

■ We need not consider whether the trial judge could lawfully allow the continuance to stretch backwards in time to cover as many days as needed to make the trial timely. *Cf. United States v. La Cruz*, 441 F.Supp. 1261, 1265 (S.D.N.Y.1977). On the basis of undisputed facts, there are sufficient additional excludable days not counted by the trial judge to have made trial on March 24 timely. This time consists of 10 days[7] from August 25, 1980, when appellant's counsel made an oral motion for time to file his motion to suppress evidence until September 5, when the motion to suppress was actually filed. This delay, like that from September 5 (when the motion to suppress was filed) to September 30 (when the suppression hearing was held) is directly attributable to appellant's suppression motion.[8] Indeed, as soon as appellant filed *this* motion on August 25, the judge scheduled the suppression hearing for September 30.

make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

(C) No continuance under paragraph (8)(A) of this subsection shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.

6. The attorney may have been influenced in making this concession by the fact that he, as well as all other participants in this March 24

hearing, including the judge, believed that the Speedy Trial period began to run on August 14, 1980, when defendant was indicted, rather than on August 25, when he was arraigned. Thus, he believed that the concession of 12 or 14 days was still insufficient as of March 24 to make a trial timely. On appeal, however, defendant concedes that August 25 is the correct date to begin the running of the Act's 70-day period. 18 U.S.C. § 3161(c)(1). In any event, we do not need to take account of this concession in holding that the trial was held within a lawful time.

7. It might, at first, seem that the period from August 25 to September 5 should count as 12 days, not 10, for the Act states as to excludable days that both the day the motion is filed and the day it is disposed of shall be counted. 18 U.S.C. § 3161(h)(1)(F); *see Furlow v. United States*, 644 F.2d 764, 768 (9th Cir. 1981). The last day, September 5, however, was already counted as excludable in the trial judge's 132 day count for it was the day the motion to suppress was filed. The first day, August 25, is the day of arraignment; hence, it was not counted as part of the basic 70-day period and was therefore already excluded for that reason. *See* 18 U.S.C. § 3161(c)(1); Fed.R.Cr.P. 45(a); and *see also* note 8 *infra*.

8. The time from September 5 to September 30 was counted as excluded by the Speedy Trial clerk and the trial judge and made up part of the 132 days that the parties agree were properly excluded.

■ Whether or not this additional delay fits within the language of § 3161(h)(1)(F), which excludes "delay resulting from any pretrial motion from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion,"[9] it should be excluded. Clause (F) is but an illustration of the general language of § 3161(h)(1), which excludes "any period of delay resulting from other proceedings concerning the defendant." That this language is meant to cover more than the examples provided in clauses such as (F) is made clear by the next few words: "including but not limited to," and by the Senate's Report which states,

> the list [of proceedings concerning the appellant] is not intended to be exhaustive. It is representative of procedures of which a defendant might legitimately seek to take advantage for the purpose of pursuing his defense.

S.Rep.No.212, 96th Cong., 1st Sess. 10 (1979). The "time-for-filing" motion, if not part of the suppression motion, is directly related to it; and all those factors favoring the exclusion of "suppression motion" time apply with equal force to it.

■ The oral motion for time to file the suppression motion thus falls within the exception set out in § 3161(h)(1). The fact that the motion was made orally and not in writing is not relevant. *See United States v. Defreitas*, 410 F.Supp. 241, 243 (D.N.J.), aff'd, 556 F.2d 569 (3d Cir.), *cert. denied*, 434 U.S. 847, 98 S.Ct. 153, 54 L.Ed.2d 114 (1977). The fact that neither the trial judge nor his speedy trial clerk passed on whether this time was excludable, so strongly pressed by appellant at oral argument, is also beside the point. The facts

are not in dispute. And, it is well established that an appellate court must affirm a judgment of a district court if it is correct as a matter of law, even if for reasons other than those cited by the district court itself. *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

■ We also find on the record that the trial judge acted within his discretion in granting a continuance from March 24 to the day of trial, March 31—a continuance that allows those days also to be excluded. 18 U.S.C. § 3161(h)(8)(A). On March 24, after denying appellant's dismissal motion, the judge set the case for trial on March 31, a week later. He based this continuance on the ground that "the ends of justice" outweighed the "speedy trial" interest. 18 U.S.C. § 3161(h)(8)(A). Appellant's counsel did not object. The district judge did not want to go forward at once because, contrary to his initial (and reasonable) expectation, appellant sought a trial by jury.[10] He also noted that appellant's lawyer had been responsible for past delays and that a government witness was unavailable. But, the record, showing no objection, strongly suggests that, once appellant lost his motion for dismissal, it simply suited the convenience of those involved that the trial take place a week later. Under these circumstances, this week was properly excluded under § 3161(h)(8)(A). *See United States v. Aviles*, 623 F.2d 1192, 1196 (7th Cir. 1980); *United States v. Davis*, 604 F.2d 474, 480 (7th Cir. 1979). Thus, since at least *18* days of excludable delay must be added to the 132 days officially excluded below, there were less than 70 days of unexcludable delay and the trial on March 31, 1981

---

9. 18 U.S.C. § 3161(h)(1)(F) states:
  (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
  (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

  . . . . .

  (F) delay resulting from any pretrial motion, from the filing of the motion through

the conclusion of the hearing on, or other prompt disposition of, such motion;

10. The district judge stated that "there was [an] ... expectation ... on the part of the court, that the case would be handled as other cases of this kind have been handled.... In these situations we have entered findings of fact based upon a stipulation and let the case go to the Court of Appeals" for review of the suppression issue.

was held within the time limits required by the Speedy Trial Act.

### III

Appellant, in his brief, attacks the jury charge as follows:

> In charging on the significance of the indictment, the judge said "it serves to put in motion the process by which *we* determine guilt after a full hearing of all the evidence." Further in his charge on the elements of the crime of possession with intent to distribute cocaine the judge stated "there isn't much to be said on the subject of possession ..." and again on the issue of possession he later instructed "now there is a certain startling inference to be drawn that he (the defendant) was, in fact, in possession." (Emphasis added.)

 Appellant argues that the first of these statements led the jury to believe that the judge would participate in finding the facts. In context, however, the word "we" referred to "we Americans," not to the judge himself.[11] The judge made clear to the jury that it was up to them not to him to determine the facts of the case. Similarly, in context, the other two statements[12] helped to make clear to the jury that the issue in the case was not whether defendant was in possession of the suitcase—he did not deny it. Rather, the issue was whether he *knew* that he was in possession of cocaine within the suitcase. The

judge explained to the jury that they were to determine whether any possession by defendant of cocaine was *knowing* and *intentional.* After reviewing the charge as a whole, see *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975); *United States v. Harrigan,* 586 F.2d 860, 863–64 (1st Cir. 1978); *United States v. Nashawaty,* 571 F.2d 71, 76 (1st Cir. 1978); *Tzimopoulos v. United States,* 554 F.2d 1216, 1218 (1st Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977), we find that it was perfectly proper.

For these reasons, the judgment of the district court is affirmed.

*Affirmed.*

---

**11.** The judge charged,
"The presumption of innocence means among other things that you are to attach no importance to the fact that an indictment has been returned in this case. That is merely an accusation. *It serves to put in motion the process by which we determine guilt after a full hearing of all the evidence.*"
(Emphasis added.)

**12.** "Well, the syntax follows the statute [*see* note 1 *supra*], I suppose, but it reads better if you think of it as reading 'knowingly and intentionally to possess cocaine with intent to distribute the cocaine.' I think it's pretty clear that there are basically two issues. We gathered that from the arguments of counsel. *"There isn't much to be said on the subject of possession,* but the question is, was the possession by the defendant knowing and intentional? That is one issue. And a sepa-

rate issue is: was this possession, if knowing and intentional, also with intent to distribute."
\* \* \* \* \* \*
"Now, here we have first the question of whether the defendant knew that he was in possession of cocaine and whether he came into possession intentionally. *Now, there is a certain startling inference to be drawn that he was, in fact, in possession.* That may not satisfy you in establishing his knowledge beyond a reasonable doubt, and it's probably not enough as a matter of law, but then let us consider all of the circumstances.
"The circumstances that you can consider as bearing on his knowledge, not being conclusive but as bearing on his knowledge, [are]. . . ."
(Emphasis added.)