UNITED STATES of America

v.

Rubiel Jesus GALLEGO–ZAPATA.

Crim. A. No. 85–443–MA.

United States District Court,
D. Massachusetts.

Feb. 14, 1986.

Ralph C. Martin, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Owen Walker, Federal Defender's Office, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

MAZZONE, District Judge.

The defendant, Rubiel Jesus Gallego-Zapata ("Gallego-Zapata"), moves to suppress all evidence seized from him when he was searched at Boston's Logan Airport on November 20, 1985. He alleges that it was seized in violation of his Fourth Amendment right to be free from unreasonable search and seizure. An evidentiary hearing was held on January 31, 1986, and there was testimony from one of the Drug Enforcement Administration ("DEA") agents who was involved in the search, a Spanish-speaking DEA agent who questioned Gallego-Zapata an hour or so after his arrest, and the defendant who testified on the limited subject matter of his age, birthplace, education, residence and employment. The hearing produced the following factual background.

### I.

Gallego-Zapata was 22 years old at the time of his arrest. He was born and raised in Viterbo, Caldas, Columbia, where he had seven years of schooling and then was employed as a truck driver. He arrived in the United States on July 4, 1985. His ability to speak and understand English is extremely limited.

On November 20, 1985, at approximately 6 p.m., Gallego-Zapata arrived in Boston's Logan Airport on an Eastern Airline's shuttle flight that had originated in New York City. Two DEA agents stationed at Logan Airport, Special Agents Mieczyslaw K. Swidwinski and Herbert Lemon, Jr., were watching the passengers who got off of that Eastern flight. It was an unseasonably warm day for November 20th in Boston. Agent Swidwinski, standing close to where the jetway opened into the terminal, noticed Gallego-Zapata as he walked down the jetway. Gallego-Zapata was alone and was walking rapidly. He had his head down, his eyes on the floor, and his face

looked "serious and stern." He carried one grey nylon shoulder bag and a thick black down-filled jacket in his arm. The two agents followed him as he walked through the terminal and took the escalator down to the baggage level. Gallego-Zapata was walking rapidly and twice looked behind him at Agent Lemon.

Once on the lower level, the agents approached Gallego-Zapata as he was half-way between the escalator and the door to the street. Agent Swidwinski stood "one step away" from Gallego-Zapata, facing him, on his left side and Agent Lemon stood in front of him. Gallego-Zapata set his bag down on the floor. Both agents showed him their badges at which point his face lost its color. Agent Lemon asked, "Can we speak with you?" Gallego-Zapata replied, "Yes." Agent Lemon then asked, "Where did you come from?" Gallego-Zapata replied, "New York." When Agent Lemon asked whether Gallego-Zapata had an airline ticket with him, he responded in broken English, and in an incomplete sentence, that he had left it on the plane. Agent Lemon asked Gallego-Zapata, in Spanish, what his name was. He responded truthfully. Agent Lemon asked him for some identification. Gallego-Zapata switched the jacket he was carrying from his right to left hand, appearing to handle it carefully, and produced a driver's license. Agent Swidwinski noticed that the pocket area looked bulky and that Gallego-Zapata's hands trembled. Agent Lemon pointed to the bag and asked, "Drogas? Drogas?" Gallego-Zapata responded, "No. No." Gallego-Zapata picked up the nylon bag and handed it to Agent Lemon. Agent Lemon asked, "Is it OK for me to look? OK to look?" Then he pointed from his eyes to the bag. Gallego-Zapata responded, "Si, si." Agent Lemon asked Agent Swidwinski to look through the bag. Agent Swidwinski found no evidence of drugs or drug paraphernalia. Agent Lemon then pointed to Gallego-Zapata's jacket and asked, "Is it OK to look? OK to look?" Again he pointed from his eyes to the jacket. Gallego-Zapata responded by shrugging his shoulders, turning his head, and nodding his head up and down twice while lifting his eyebrows. Agent Lemon found a paper bag in Gallego-Zapata's jacket pocket containing two four-ounce packets of a white powdery substance later determined to be cocaine. The agents arrested him.

Later in the evening, in the Boston DEA office, Gallego-Zapata was questioned by a Spanish-speaking DEA agent, Guadalupe Aquilar. It was part of her job to translate for Spanish-speaking arrestees. Gallego-Zapata waived his right to remain silent. Agent Aguilar asked him why he permitted Agent Lemon to search his things. Gallego-Zapata told her it was because Agent Lemon showed him his badge. He further told her that he had been paid $200 for bringing the half-pound of cocaine from New York to Boston.

## II.

This case presents the now familiar scenario of an "airport stop." Determining whether law enforcement has overstepped its bounds requires a highly fact-specific inquiry because no two airport stops are the same.[1] Nevertheless, the general Fourth Amendment principles applicable to airport stops are relatively clear and easy to state.

▮ Police officers may approach someone in a public place, identify themselves, ask whether the individual is willing to answer questions, and use any voluntary responses they receive in a criminal prosecution without the Fourth Amendment being implicated. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75

---

1. "Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." *Florida v. Royer,* 460 U.S. 491, 506–07, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (opinion of White, J.).

L.Ed.2d 229 (1983) (opinion of White, J.); *United States v. Manchester*, 711 F.2d 458, 460 (1st Cir.1983). However, officers may not detain an individual, "even momentarily," without "reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324 (opinion of White, J.). Once there is a detention, that is, a "seizure," the Fourth Amendment comes into play. "[A] person has been seized for purposes of the Fourth Amendment when a law enforcement officer, by means of physical force or show of authority, has in some way restrained his [or her] liberty such that a reasonable person would not feel free to walk away." *Manchester*, 711 F.2d at 460; *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27 (opinion of White, J.); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *Terry v. Ohio*, 392 U.S. 1, 16, 19 n. 16, 88 S.Ct. 1868, 1877, 1879 n. 16, 20 L.Ed.2d 889 (1968). In order to justify a seizure of the magnitude of a limited investigative stop, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880; *Manchester*, 711 F.2d at 461 (quoting *Terry*). In other words, the police must have "an articulable and reasonable suspicion that [the suspect] is engaged in criminal activity." *United States v. Streifel*, 781 F.2d 953, 957 (1st Cir.1986).

 Limited investigative stops where the officer has reasonable, articulable suspicion, but not probable cause, to believe that the suspect is engaged in criminal activity do not allow the officer to perform a "full search." *Royer*, 460 U.S. at 499, 103 S.Ct. at 1325 (opinion of White, J.). The scope of the detention and of any questioning or search pursuant to the detention must be "carefully tailored." *Id.* at 500, 103 S.Ct. at 1325 (opinion of White, J.). Without a warrant, probable cause, or exigent circumstances, a search of a suspect's

luggage (or jacket pockets) is not reasonable. *Id.* at 497, 103 S.Ct. at 1323–24 (opinion of White, J.). It can, however, be justified if the suspect voluntarily consents to it. *Id.*; *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973).

 Voluntariness is a question of fact and depends on the totality of the circumstances. *Id.* at 248–49, 93 S.Ct. at 2058–59. The government bears the burden of proving that the defendant's consent was "freely and voluntarily given." *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (opinion of White, J.); *United States v. Rodriguez Perez*, 625 F.2d 1021, 1024 (1st Cir. 1980). The government has not met its burden when all it has proven is "mere submission to a claim of lawful authority." *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (opinion of White, J.). Although telling a suspect that he or she need not consent to a search is not required in order for a court to conclude that the consent was freely given, if done, it is strong evidence of voluntariness. And if not done, it can be part of the totality of the circumstances that indicate that consent was not truly voluntary. *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059.[2]

 The inquiry is into the subjective mental state of the defendant, and relevant factors include age, education, intelligence, experience with law enforcement, race and sex compared with race and sex of the officers, whether the defendant knew consent could be refused, whether the defendant was in custody when the consent was given, and whether the police misled the defendant about their lawful authority. *See, e.g., Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879; *Schneckloth*, 412 U.S. at 226, 248–49, 93 S.Ct. at 2058–59; *Bumper v. North Carolina*, 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *Rodriguez Perez*, 625 F.2d at 1024–25.

 If the defendant "consents" while being illegally detained, that consent is viti-

---

2. This is not, however, to say that the government *must* prove knowledge of the right to

refuse. *Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059.

ated unless the government proves that it was not "the product of the illegal detention," but the "result of an independent act of free will." *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (opinion of White, J.) (citing *Dunaway v. New York*, 442 U.S. 200, 218–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979), *Brown v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975), and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

Thus, in light of these principles, this Court must first decide whether a seizure within the meaning of the Fourth Amendment took place. If so, this Court must decide when it occurred and whether at that time the agents had a reasonable, articulable suspicion of criminal activity to justify the seizure. If they did not have a reasonable, articulable suspicion, then Gallego-Zapata's detention was illegal, and the Court must decide if Gallego-Zapata's subsequent consent to the search of his jacket was tainted by the illegality or independent of it. Even if the agents had a reasonable, articulable suspicion, the question of the voluntariness of Gallego-Zapata's consent arises because the search was more intrusive than one which would have been justified solely on the basis of reasonable, articulable suspicion.[3] Finally, even if there were no seizure, the voluntariness of Gallego-Zapata's consent must still be addressed.[4] I address each step *seriatim*.

### III.

*Seizure*

■ The government's position is that the agents' initial approach to Gallego-Zapata did not implicate the Fourth Amendment. However, it concedes that at some point during the questioning, the situation escalated into a *Terry*-seizure. In other words, at some point, a reasonable person would not have felt free to walk away. In response to the court's questioning at the hearing, the government stated that it believed a seizure occurred when, after identifying themselves as DEA agents and asking Gallego-Zapata whether he would speak with them, the agents asked him from where he had arrived.

To determine when a seizure occurred, that is, when a reasonable person would not have felt free to walk away, it will be helpful to compare the facts of the present case with the facts of Supreme Court and First Circuit cases on point.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the Supreme Court held that a seizure occurred when the officer grabbed the defendant, spun him around, and began to pat down his outer clothes. Prior to grabbing the defendant the officer had approached him on the street, identified himself, and asked him his name. No questioning took place beyond the initial self-identification, so while *Terry* can be read as holding that physical force amounts to a seizure, it cannot be read as holding that anything less than physical force does not amount to a seizure.

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) two of the justices who formed the plurality held that no seizure had occurred when two non-uniformed DEA agents approached defendant in an airport concourse, identified themselves, requested to see her identification and airline ticket, and obtained her voluntary consent to accompany them to the DEA airport office and be searched, despite the fact that they did not

---

**3.** The government does not contend, nor could it, that the agents had probable cause to justify the search. Instead they rely on the consent exception to the probable cause requirement.

**4.** Thus, consent is the key to the lawfulness of this search, and it may appear that analyzing whether there was a *Terry*-seizure and whether it was reasonable are not necessary since without probable cause the search could only be

deemed reasonable if Gallego-Zapata consented to it. However, the issue of whether Gallego-Zapata was being illegally detained when he consented to the search is relevant to the issue of consent because "unlawful detention puts a different character on the voluntariness of his behavior." *United States v. Viegas*, 639 F.2d 42, 44 (1st Cir.), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981).

explicitly tell her she could refuse. *Id.* at 555, 100 S.Ct. at 1877–76 (opinion of Stewart, J.).[5] The other three justices who formed the plurality stated that they did not necessarily disagree with this conclusion, but felt that it was not an issue they should reach since it had not been considered below. They noted that whether the defendant "reasonably could have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket is extremely close." *Id.* at 560 & n. 1, 100 S.Ct. at 1880 & n. 1 (opinion of Powell, J.).

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) four justices stated:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

*Id.* 460 U.S. at 501, 103 S.Ct. at 1326 (opinion of White, J.). The other justice who formed the plurality believed that Royer was seized when, after the officers identified themselves, they asked him to produce a driver's license and airline ticket. *Id.* at 511, 103 S.Ct. at 1331 (Brennan, J., concurring in result).

In *Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam) the Court *assumed,* but *did not decide,* that the defendant was seized when, after being approached in an airport concourse by a DEA agent who identified himself and asked him to step aside, the defendant agreed to talk, moved to where his cohorts and another officer were standing, produced identification, and ultimately

granted the officers permission to search his luggage. *Id.* at 311.

For this Circuit's guidance we look first to *United States v. Manchester,* 711 F.2d 458 (1st Cir.1983), in which the court concluded that continued detention of a traveler in an airport concourse after the traveler identified himself and told the agents where he had been and for how long amounted to a seizure. This conclusion may now be questioned, however, because in reaching it, the court relied on its first decision in *United States v. Berryman,* 706 F.2d 1241 (1st Cir.1983) ("*Berryman I* "). That decision was reheard and reversed after *Manchester* was decided. *United States v. Berryman,* 717 F.2d 650 (1st Cir.1983) (per curiam) ("*Berryman II* "), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984). The basis for the reversal is somewhat confusing and so it is not clear exactly what light *Berryman II* or *Manchester* can now cast on the problem of seizure. In *Berryman II,* the First Circuit said in a per curiam decision that it was reversing *Berryman I* "primarily" upon having found that Berryman's consent to search his luggage was voluntary. (This is a ground that was analytically separate from the issue of seizure.). However, it also stated that its decision to reverse was "for the reasons set forth in the panel's dissent" in *Berryman I.* That dissent had disagreed with the majority as to *when* the seizure had occurred. Therefore, reliance on *Berryman II* or *Manchester* for guidance on the issue of when a seizure occurs does not seem appropriate.

In *United States v. Regan,* 687 F.2d 531 (1st Cir.1982) and *United States v. Jodoin,* 672 F.2d 232 (1st Cir.1982), the First Circuit addressed the issue of when a seizure occurred in an airport encounter. In *Regan,* the court held that no seizure had occurred when two non-uniformed officers displaying no weapons approached Regan as he was about to leave the terminal, asked if he would speak to them, positioned themselves

---

**5.** The two justices also gave "examples of circumstances that might indicate a seizure": threatening presence of several officers, display of weapons by an officer, physical touching, or

use of language or tone of voice indicating that compliance might be compelled. *Id.* at 554, 100 S.Ct. at 1877 (opinion of Stewart, J.).

on either side of him but did not block his path, touch him, or in any way physically restrain him, asked where he had been and for how long, asked for his identification and ticket, asked whether they could search his larger bag, and told him he did not have to consent. Regan refused to allow them to search it and asked what would happen if he so refused. The officers told him he could leave provided he left his bag with them because they wanted to get a trained dog to sniff it. Regan did so. Part-way through the questioning a friend of Regan's who had come to pick him up and drive him home approached. She waited for Regan until the police were through with him. They left together, but the police retained the bag.

In *Jodoin* the First Circuit held that no seizure had occurred during the following encounter: Jodoin, after leaving the baggage claim area, was approached by one DEA agent who identified himself and asked to speak to Jodoin. Jodoin answered the agent's questions concerning his name, identification, where he had travelled from, and whose suitcase he was holding. Then Jodoin refused to let the agent search his suitcase, picked it up, and went outside of the terminal to a cab stand. The agent followed him and Jodoin asked whether he was under arrest. The agent said no, but asked Jodoin whether he would continue the conversation at the DEA airport office. Jodoin agreed. The agent told him there was a phone there in case he wanted to call his attorney. When they got to the office, the agent told Jodoin he wanted to have a trained dog sniff the luggage but the dog was not immediately available. The agent told Jodoin he could leave, provided he left his bag with the agent. Jodoin left after twenty minutes and left the bag.

These Supreme Court and First Circuit cases provide no clear answer to the question of when a seizure occurred in the instant case. There is no coherent majority position in the Supreme Court, and all of the Supreme Court and First Circuit cases differ significantly from the present one on their facts. Extracting from these cases the guidance that is available, I conclude that the Fourth Amendment was not implicated when the agents initially approached Gallego-Zapata as he was heading out of the terminal, showed him their badges and asked him if he would speak to them. Thereafter, as the government conceded, when the agents continued their questioning and asked him where he had travelled from and to produce his airline ticket and identification, a *Terry*-seizure had occurred. At that point a reasonable person would not have felt free to walk away. Clearly the agents' questions were in the manner of an investigation—an attempt to verify or dispel their suspicions. *See, e.g., Royer,* 460 U.S. at 502, 103 S.Ct. at 1326–27 (opinion of White J.). This went well beyond a casual encounter with a law enforcement officer in a public place. Furthermore, although Gallego-Zapata was at an airport, which is public, he was *inside* the terminal rather than at the curb where he could have gotten on a bus or hailed a taxi in order to escape the officers' questioning. He was stopped as he headed for the outside doors. Agent Lemon stood in front of him. Agent Swidwinski stood "one step away" from Gallego-Zapata at his side, facing him. The agents never told him that he did not have to remain or answer any questions.

This conclusion is certainly not inconsistent with any of the Supreme Court jurisprudence on the subject. Had the agents used force (as in *Terry*) or confined him in a small room while retaining his identification and without indicating that he could leave (as in *Royer*), the conclusion that he had been seized would be somewhat more apparent. But the Fourth Amendment protects individuals from subtle as well as blatant invasions of their privacy rights by law enforcement officials. Certainly these cases do not indicate that without force or such confinement no seizure is possible. Three justices indicated that whether a defendant reasonably feels free to walk away when approached in an airport and asked for her driver's license and airline ticket is "an extremely close question." *Mendenhall,* 446 U.S. at 560 n. 1, 100 S.Ct. at 1880

n. 1 (opinion of Powell, J.). While two justices have explicitly found that such is not a seizure, *id.* at 555, 100 S.Ct. at 1877–78 (opinion of Stewart, J.), one has explicitly found that it is a seizure, *Royer,* 460 U.S. at 511, 103 S.Ct. at 1331 (Brennan, J., concurring in result).

This conclusion is also not inconsistent with any of the First Circuit teaching on the subject. While the court found no seizure in *Regan* or *Jodoin* when the officers asked for the traveller's identification and ticket, both of those cases are distinguishable. In each case, the agents were most concerned with the luggage the traveller was carrying, and the court focused on the issue of whether the length of time the officers detained the bags for the purposes of obtaining a canine-sniff was so extensive that it violated the Fourth Amendment. Furthermore, the facts of *Regan* and *Jodoin* differ significantly from those in the instant case. In *Regan,* the defendant was told that he did not have to consent to any search of his bags. Then he acted in a way that indicated that he knew he was free to walk away: he refused to permit the search and asked what would happen if he refused. Furthermore, he was aware that his friend was standing by to take him home. In *Jodoin,* the defendant also indicated that he knew he was free to walk away: he refused to let the agent search his suitcase, walked away from the agent and to a cab stand, and was told he could leave provided he left his bag with the agent. The bottom line in both of these cases was that the defendant ended his encounter with the police by *walking away.* While the test for whether a seizure occurred is an objective one (whether a reasonable person would have felt free to walk away), the First Circuit had available to it strong circumstantial evidence of the

defendant's own state of mind, and it used that evidence in deciding whether a seizure had occurred.[6]

*Reasonable, articulable suspicion.*

 The next issue is whether the agents had a reasonable, articulable suspicion that Gallego-Zapata was involved in criminal activity when they seized him. The agents knew:

(1) Gallego-Zapata arrived in Boston from New York, a "source city";

(2) Despite the unseasonably warm weather, Gallego-Zapata carried a heavy down jacket;

(3) Gallego-Zapata walked rapidly with his head down and a "serious and stern" look on his face;

(4) Gallego-Zapata looked behind him twice at Agent Lemon as he walked through the terminal and took the escalator down to the baggage level; and

(5) Gallego-Zapata's face paled when he saw the agents' badges.

In deciding whether these facts are sufficient to constitute a reasonable, articulable suspicion of criminal activity, I must review the findings of the Supreme Court and First Circuit on this issue in similar cases.

In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Supreme Court held, on facts that were stronger than those here, that the agents did not have a reasonable, articulable suspicion of criminal activity.[7] Reid had arrived at the Atlanta Airport (1) from a "source city"; (2) in the early morning hours when law enforcement activity is diminished; (3) he had no luggage other than a shoulder bag; and (4) he and a companion tried to conceal the fact that they were together.[8] The Court stated that all of the

---

6. *See, e.g., Regan,* 687 F.2d at 535–36 ("Regan's own testimony, and his conduct during the encounter, such as his refusal to permit his larger bag to be searched after being told he could refuse, tend to support the district court's conclusion that he was not intimidated nor placed under restraint. We accordingly sustain the lower court's finding that a seizure did not occur.").

7. Eight justices found that the agents had no reasonable, articulable suspicion. One disagreed.

8. The defendant exited the plane several people ahead of another man. As he walked through the terminal, the defendant looked back at the other man occasionally. The second man caught up with the defendant in the main lobby

facts other than the last one were consistent with innocent behavior and to hold that so little could justify a seizure would be to allow "virtually random seizures" of presumably innocent travellers. *Id.* at 441, 100 S.Ct. at 2754. As for the last circumstance, the agent only *believed* that they were trying to conceal the fact that they were together, and such a belief was "more an 'inchoate and unparticularized suspicion or "hunch," ' than a fair inference in the light of his experience." *Id.* (citation omitted).

In *Mendenhall,* three justices found that the following facts constituted a reasonable, articulable suspicion, while four justices (in dissent) [9] found they did not: the defendant arrived in Detroit airport, which is frequented by drug couriers, from Los Angeles, a source city. She was the last to leave the plane, seemed very nervous, and scanned the whole area when she arrived. She did not claim any luggage, but changed airlines for a flight out of Detroit. The agents learned from questioning her that her ticket and driver's license bore different names, she had only been in Los Angeles for two days, and she was quite shaken when they identified themselves as narcotics detectives. The four justices who felt the agents did not have a reasonable, articulable suspicion reasoned that her conduct in changing planes was consistent with innocent behavior and that the fact that she exited the plane last was "plainly insufficient." As for arriving from a source city, they dismissed that fact by citing *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), and *Sibron v. New York,* 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968) for the proposition that mere proximity to an area that has a high incidence of drug activity does not provide reasonable

suspicion for an investigative stop. *Mendenhall,* 446 U.S. at 572, 100 S.Ct. at 1886 (White, J., dissenting).

In *Royer,* four justices agreed that the following facts provided a reasonable, articulable suspicion, while one found that they did not: Royer paid cash for a one-way ticket with a large number of bills, he was young, casually dressed, pale, nervous, and looked around at other people. He carried two suitcases that appeared heavy, he wrote only his last name and the name of the airport where he was to land on his luggage identification tags, and he bought a ticket to go to a "target city." When the agents questioned him, they learned he was travelling under an assumed name.

Finally, in *Rodriguez,* the Court in a per curiam decision to which three justices dissented, held that the following facts were sufficient to constitute a reasonable, articulable suspicion: the defendant was noticed along with two others in a source city airport. The agents followed them through the concourse and onto an escalator. One of Rodriguez's cohorts looked back, saw the detectives, and spoke in a low voice to Rodriguez. Then Rodriguez looked back directly at the detectives, turned around quickly and spoke to his companion. His companion looked at the detectives and said, "Let's get out of here," and then in a lower voice, "Get out of here." Rodriguez attempted to move away but when prevented from doing so by the agent, swore at the agent.

In the instant case, as in *Reid,* almost all of the facts the agents relied on were entirely consistent with innocent behavior.[10] (Those that were not consistent were that Gallego-Zapata looked twice at Agent Lemon and his face paled when he saw the badges.) The fact that he arrived from a city where there is a high incidence of drug

and the two spoke briefly before leaving together.

**9.** The other two justices who formed the plurality did not reach the issue.

**10.** Although it is not a complete answer to say that all of the defendant's actions were consistent with innocent behavior, *United States v. Viegas,* 639 F.2d 42, 44 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981), that certainly is probative of whether the agents had a reasonable, articulable suspicion. *See, e.g., Reid,* 448 U.S. at 441, 100 S.Ct. at 2754.

activity, although considered relevant in many cases, does not necessarily provide reasonable suspicion for an investigative stop. *Mendenhall,* 446 U.S. at 572, 100 S.Ct. at 1886 (White, J., dissenting). The fact that he carried a down jacket even though the day was unseasonably warm could not have raised anyone's suspicion. It is not unusual for the weather in the Northeast to change abruptly in late November. Similarly, it would not be surprising for airline passengers on a short shuttle flight to walk rapidly with a serious look on their faces. That Gallego-Zapata looked back twice and paled are more telling, but in themselves, or in addition to the facts listed above, they are not sufficient for me to hold that the agents had more than an "inchoate and unparticularized suspicion or 'hunch.' " *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.[11] In *Royer* and in *Rodriguez,* the defendant's behavior was much more suspicious than it was in the instant case. In *Royer* the defendant paid in cash for a one-way ticket and travelled under an assumed name. In *Rodriguez* the defendant and his cohorts noticed the agents and attempted to flee.

The First Circuit has addressed the sufficiency of the officers' suspicions in effectuating a *Terry*-stop in an airport in four cases, and it has found in each that the officers had a reasonable, articulable suspicion. The facts of each case are much stronger than the facts in the instant case, and thus they are distinguishable. In *Manchester,* in addition to observing that the defendant arrived from a source city, and looked over his shoulder while making a rapid and watchful exit, the agent had overheard a conversation the defendant had had with an airline employee as he exited the plane. In that conversation the defendant admitted to having gone to Florida on a one-day vacation. The court stated that the implausibility of a one-day vacation was sufficient to arouse the suspicions of the agents.

In *United States v. Viegas,* 639 F.2d 42 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981), the defendant arrived from a source city and made a phone call during which he kept the door of the booth open and scanned the corridor. Then he was met by a man and both entered adjoining phone booths. They appeared not to put coins in the phones, but kept the doors open, peered up and down the corridor, and conversed with each other. Later as they walked through the terminal, they looked behind them five or six times.

In both *Regan* and *Jodoin,* the final First Circuit cases directly on point, the defendants had been observed engaging in suspicious activity in the Fort Lauderdale airport by detectives, the Florida detectives had called the detectives at Logan Airport and reported the suspicious activities as well as additional information they had gathered. The detectives in Boston were able to add that information to the suspicious behavior that they had observed in Logan Airport.

In all four of these First Circuit cases, the agents had much more suspicious activity to go on than they did in the instant case. Therefore, having engaged in this highly fact-specific inquiry, viewing the facts in their entirety, *Viegas,* 639 F.2d at 45, and giving due credit to the expertise of the officers who conducted the stop, *Mendenhall,* 446 U.S. at 566, 100 S.Ct. at 1883 (opinion of Powell, J.), *Viegas,* 639 F.2d at 45, I must conclude that the agents lacked a reasonable, articulable suspicion when they seized Gallego-Zapata. Thus, at the time Gallego-Zapata "consented" to the search of his bag and later his jacket he was being unlawfully detained.

*Consent*

█ The final issue I must explore is whether Gallego-Zapata freely and voluntarily consented to the search, despite his earlier illegal detention. Was his consent,

---

**11.** There is serious doubt in my mind whether the agents ever would have focused on Gallego-Zapata among the passengers exiting the New York shuttle in Boston at 6 p.m. on a weekday had he not appeared to them to be of hispanic origin.

in other words, free of any taint of the illegal seizure?[12]

As explained earlier, voluntariness is a question of fact that depends on the totality of the circumstances. The government bears the burden of proving that the defendant's consent was "freely and voluntarily given," and in a case like this, where it follows an illegal detention, the government must prove that consent was not the product of the illegal detention, but the result of an independent act of free will. Consent can not be proven by showing a mere submission to a claim of lawful authority, and the fact that the defendant was not told he could refuse is relevant to the inquiry. What is at issue is the subjective mental state of the defendant, and the most this court has to go on since the defendant did not take the stand to testify on the issue of consent is circumstantial evidence.

In the instant case the government has not borne its burden of proving that Gallego-Zapata's consent to the search of his jacket was freely and voluntarily given.[13] The evidence was that Gallego-Zapata was twenty-two years old, had been in school for a total of seven years in Columbia, and then had been employed as a truck driver. His ability to speak and understand English was extremely limited. He had only recently arrived in the United States and so probably lacked familiarity with his rights under the United States Constitution, including his right to insist that the officers obtain a search warrant. The evidence strongly suggests that he merely submitted to what must have appeared to him to be a "claim of lawful authority." When the agents approached and stood close to

him, he immediately placed his bag on the floor and answered their questions forthrightly and honestly. Later he told Agent Aquilar that he consented to the search because Agent Lemon had showed him his badge. It is not at all clear that when he began answering their questions he understood them to be narcotics officers rather than immigration officers. Furthermore, the agents and Gallego-Zapata were having difficulty communicating because of Gallego-Zapata's limited skills in English, and the agents resorted to a combination of short English sentences and sign language to convey to him that they wanted to search his jacket. The agents never told him that he could refuse to allow them to search. Most telling was the manner in which he responded to Agent Lemon's inquiry regarding the jacket: "Is it OK to look? OK to look?" while pointing from his eyes to the jacket. Gallego-Zapata's response, described and demonstrated by Agent Swidwinski, was to shrug his shoulders, turn his head, and nod his head up and down twice while lifting his eyebrows. In my view, this response was clearly one of resignation, and could not be characterized as free and voluntary approval.

Furthermore, at the time Gallego-Zapata "consented" to the search of his jacket, he was being illegally detained. A reasonable person in his position would not have felt free to walk away; the evidence illustrated that he did not feel free to walk away. The voluntariness of his submission of his jacket to the agents is seriously undermined by the fact that he was not aware that he could walk away and refuse to permit the search. There was no evidence of any "break in the chain of illegality."[14]

**12.** The government does not contend, nor is there any evidence to support the argument, that the agents had probable cause to arrest the defendant at the time they searched his jacket. The government relies, instead, on the argument that the defendant consented to the search.

**13.** Whether Gallego-Zapata freely and voluntarily consented to the search of his *bag* is not at issue because no evidence of illegal activity was found in it.

**14.** Even disregarding the illegality of Gallego-Zapata's detention, I find his consent was not voluntary. In light of what I found to be an illegal detention, a finding of lack of consent is even more compelling. *See, e.g., Royer,* 460 U.S. at 507–08, 103 S.Ct. at 1329–30 (opinion of White, J.) (the United States Supreme Court, after having found that Royer was being detained illegally when he consented, concluded without any discussion that the consent was tainted).

**676**

### Conclusion

The Fourth Amendment to the United States Constitution guarantees to persons in the United States the right to be free from unreasonable searches and seizures. The price the government pays for engaging in an unlawful search or seizure is the inability to use any evidence so garnered in a criminal proceeding against the individual whose Fourth Amendment rights were violated. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Courts sometimes find this exclusionary rule "difficult" to enforce because often its practical result is that someone who may very well be guilty is never brought to trial. The benefit to society is so great, however, that the trade-off has been deemed worthwhile for more than seventy years. Conscientious scrutiny of police activity in light of the mandates of the Fourth Amendment means that *all* persons in the United States reap the benefits of a free society where they can go about their daily business without unreasonable governmental intrusion. *Id.* at 392, 393, 34 S.Ct. at 344 (The Fourth Amendment's "protection reaches all alike, whether accused of crime or not.... The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.").

Accordingly, for the reasons set forth above, the defendant's motion to suppress all evidence seized from him at Logan Airport on November 20, 1985, is granted.

SO ORDERED.