UNITED STATES of America

v.

Kim PIRELLI.

Crim. No. 86–144–W.

United States District Court,
D. Massachusetts.

Nov. 13, 1986.

Supplemental Memorandum and
Order Dec. 5, 1986.

Asst. U.S. Atty. Oliver C. Mitchell, Jr., Boston, Mass., for plaintiff.

Daniel G. Harrington, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

WOLF, District Judge.

Defendant Kim Pirelli was arrested at Logan Airport on April 18, 1986 and indicted on April 29, 1986 for possession of phencyclidine ("PCP") with intent to distribute in violation of 21 U.S.C. § 841(a)(1). On August 4, 1986, the defendant moved to suppress all evidence of PCP obtained from her bag on April 18, 1986. Defendant contends that this evidence was taken in violation of her Fourth Amendment right to be protected against unreasonable searches and seizures. The court agrees.

The court commenced an evidentiary hearing concerning this Motion to Suppress on September 3, 1986 (the "Suppression Hearing"). Pirelli, Officer James Turney, and Drug Enforcement Agent Guadalupe Aguilar testified on September 3. At the hearing, the parties agreed that the court should listen to the tape of Aguilar's testimony at the April 21, 1986 detention hearing (the "Detention Hearing"). The tape disclosed inconsistencies in the testimony of Agent Aguilar at the Detention and Suppression Hearings. Counsel were so informed by the court on September 12, 1986. At the court's direction, the Suppression Hearing was reopened and continued on October 3, 1986. Pirelli, Turney, and Aguilar, as well as Attorney Joseph P. Hennelly, Jr. testified on October 3.

For the reasons stated below, the court finds the PCP found in Pirelli's bag on April 18, 1986 was discovered as a result of an unreasonable search and seizure in violation of the Fourth Amendment. Defendant's motion to suppress must, therefore, be granted.

On October 3, Aguilar admitted to testifying falsely on September 3. The court has considered *sua sponte* whether this case should be dismissed because of Aguilar's false testimony. Dismissal has been determined to be inappropriate because the false testimony did not cause incurable prejudice and there is no evidence that Aguilar's false testimony is part of a recurrent pattern of similar misconduct that might warrant dismissal to deter future lawlessness. The court does, however, order that the government address the issue of whether the court should consider further a contempt proceeding relating to Aguilar's false testimony.

## I. FINDINGS OF FACT

Upon consideration of the evidence presented, including an assessment of the credibility of the witnesses, the court finds the facts of this case as follows.

On April 18, 1986, Aguilar and Turney were on duty at Logan Airport. Transcript of September 3, 1986 Suppression Hearing at 5–6; hereinafter "September 3, 1986 Tr." Turney, a member of the Chicago Police Department for twenty-one years, was assigned to Logan Airport as a Special Deputy United States Marshal participating in a narcotics interdiction program organized by the Drug Enforcement Administration ("DEA"), the Federal Bureau of Investigation, and local police agencies. September 3, 1986 Tr. at 5. Turney has participated in about 500 arrests involving the seizure of narcotics at airports. *Id.* at 4. His partner was Aguilar, who had been a DEA Special Agent for approximately two years. October 3, 1986 Tr. at 7.

On April 18, 1986, Pirelli was nineteen years old and had a tenth grade education. October 3, 1986 Tr. at 61. Sometime after April 18, 1986, Pirelli learned she was pregnant. *Id.* at 62.

On April 18, 1986, Aguilar and Turney were observing passengers arriving on the Eastern Shuttle from New York. September 3, 1986 Tr. at 6. At about 3:00 p.m.

Pirelli deplaned. *Id.* at 7. Pirelli did not know where the baggage claim was for her flight; so she asked for directions. September 3, 1986 Tr. at 47.

Aguilar was the first to suspect Pirelli. At the Suppression Hearing Aguilar testified: "I noticed [Pirelli] as soon as she got off the flight and it just raised my suspicion. Call it a sixth sense. I don't know." September 3, 1986 Tr. at 74. Aguilar characterized her "sixth sense" as a "hunch." *Id.* Aguilar told Turney to watch Pirelli, because "she was looking around and walking real slow." *Id.* at 8.

Turney noticed that Pirelli "wasn't wearing any jewelry. She had a very worn pair of blue jeans on, and what appeared to be very bright ... yellow, high heeled shoes." *Id.* at 8–9. Her "hair appeared to be oily and hadn't been combed. She had no make up on." *Id.* at 9.

Pirelli waited about fifteen minutes for her luggage. *Id.* at 47. During this time Turney noticed, "She was shifting back and forth, [because of] either frustration or nervousness." *Id.* at 10. Her luggage consisted of a blue vinyl bag, approximately 18 by 18 by about 4 inches. *Id.* at 11. Turney noticed "when she picked the bag up there was no resistance at all. The bag appeared to be very light ..." *Id.* at 11. After she picked up her bag, Pirelli "quickly moved from retrieving the bag out the exit door" to the bus and taxi lane. *Id.* at 12. Pirelli was waiting for her ride. *Id.* at 48.

At this point the two officers approached Pirelli and identified themselves. As described below, there is a dispute about some of what was said and the order in which it was said. There is agreement, however, that the officers were polite throughout the entire encounter. *Id.* at 57. They did not touch Pirelli. *Id.* Nor did they block her path. *Id.* at 13.

After the officers identified themselves, Pirelli was told they were conducting a narcotics investigation. October 3, 1986 Tr. at 45; September 3, 1986 Tr. at 17. Pirelli was asked if she had any identification. September 3, 1986 Tr. at 14. She

said she did not. *Id.* at 15. She was asked her name, her age, where she was coming from, and where she lived. *Id.* at 14–16. She answered all these questions truthfully. *Id.* at 76. As the encounter continued, Pirelli became "a little nervous." October 3, 1986 Tr. at 53.

On September 3, Pirelli testified that after identifying themselves the officers said, "We have reason to believe that you have narcotics in your bag." September 3, 1986 Tr. at 49. Pirelli asked why and, she testified, "they said that they received a telephone call fitting my description of a young girl ... carrying a large substance of drugs." *Id.* On October 3, she testified that after she asked why she had been stopped, Turney responded, " 'Well, we received a telephone tip of a young lady fitting your description, explaining that you might be carrying a large amount of narcotics.' " October 3, 1986 Tr. at 46.

Both Turney and Aguilar consistently denied telling Pirelli they had received a telephone tip which influenced their suspicion of her. September 3, 1986 Tr. at 34; October 3, 1986 Tr. at 7, 29, 30. In any event, the officers testified, and the government conceded, there was no such tip. October 3, 1986 Tr. at 9; Government's Third Memorandum in Opposition to Defendant's Motion to Suppress Evidence at 12.

For the reasons explained below, the court finds that it is not necessary in order to decide the Motion to Suppress to resolve the conflict concerning whether either officer told Pirelli outside the terminal that there was a tip. Thus, the court has not decided this question.

It is undisputed that after the preliminary questioning described earlier, Turney asked Pirelli if he could look in her bag. September 3, 1986 Tr. at 37, 50, 77; October 3, 1986 Tr. at 29, 31, 37, 45, 46. Although there were varying versions of the closely related conversation presented, the court finds that as Turney testified on October 3, Turney also then told Pirelli that she had a right not to consent to the search of her bag, but if she did not consent he

would attempt to get a search warrant.[1] Turney did not then say Pirelli was free to leave, with or without her bag. September 3, 1986 Tr. at 78. Pirelli said that she would like to call her attorney. September 3, 1986 Tr. at 17.

At this point, Pirelli did not believe that she was free to leave with her bag. Nor would a reasonable person have felt he or she could leave with the bag.

When Pirelli asked to call her attorney, Turney said she could. September 3, 1986 Tr. at 17. Pirelli then picked up her luggage and started to walk back to the terminal. *Id.* Aguilar and Turney followed a few steps behind her. *Id.* After walking a short distance, Pirelli turned around and told the officers she did not have any money to make a call. *Id.* at 18. Turney gave Pirelli some change so she could use the telephone. *Id.* at 18–19, 58.

Once inside the terminal, Pirelli made a telephone call, and then waited by the telephone for a return call. *Id.* at 59. In the ten minutes before the return call, Turney noticed that the bag had a name tag on it. April 21, 1986 Tr. at 22; September 3, 1986 Tr. at 19, 38–39. He knelt down to examine the bag. April 21, 1986 Tr. at 22. The name on the identification tag was not Pirelli's. September 3, 1986 Tr. at 19. In response to a question, Pirelli told Turney the bag belonged to a friend. *Id.* at 20.

Turney was looking up at Pirelli while holding the identification tag. *Id.* at 21. When he "knelt completely down" to examine the address on the bag he smelled an "extremely strong odor of ether coming from the bag." September 3, 1986 Tr. at 21. The odor of ether is associated with PCP. September 3, 1986 Tr. at 21. When he smelled the ether, Turney decided he was going to detain the bag. *Id.* at 44. Up to that point he was wavering about detaining the bag because his "gut instinct [was] that something was going on but ... [he] didn't really have ... [his] mind made up as to what it could be." *Id.* at 44.

After smelling the ether, Turney told Pirelli that he was going to take her luggage to a baggage claim area thirty or forty yards away for a canine sniff. *Id.* at 22; Report of Investigation, Exhibit 3. Turney told her that if the dog alerted, the officers would attempt to get a search warrant. September 3, 1986, Tr. at 22. He also told her that she was free to go or to watch the dog sniff. *Id.* at 23, 62. In addition, Turney said that if she left and the dog did not alert to the bag, the government would ship the bag wherever she wanted at its expense. September 3, 1986 Tr. at 23. Pirelli said she wanted to wait for her lawyer to return her call. *Id.*

Pirelli's bag was put in the center of a baggage line-up with four or five other

---

1. On October 3, Officer Turney testified that he asked Pirelli for consent to search her bag. He also "advised her that she had a right not to allow search of the bag, that an attempt would be made to get a search warrant." October 3, 1986 Tr. at 29. On September 3, Turney testified to asking Pirelli if they could search the bag, but did not mention his reference to a search warrant. September 3, 1986 Tr. at 37. At the Detention Hearing Turney said nothing about asking to search the bag or seeking a search warrant. April 21, 1986 Tr. at 20–21.

On September 3, Aguilar testified that the officers asked Pirelli if they could look into her bag, *id.* at 77, 83, and it was this question that prompted Pirelli to ask to speak to her attorney. However, when questioning focused on this issue on October 3, Aguilar testified she did not remember what was said immediately before Pirelli asked to speak to her attorney. October 3, 1986 Tr. at 23. The court has, therefore, ignored Aguilar's testimony on this point.

On October 3, Pirelli agreed that Turney told her he would attempt to get a search warrant if she refused to let him search her bag. *Id.* at 46, 53.

The court concludes that outside the terminal Turney told Pirelli he would attempt to get a search warrant if she refused to allow the search. The court focused Turney's attention on this point at the October 3 hearing and he stated that it was his regular practice to use this statement, and he was almost positive he used it in this instance. October 3, 1986 Tr. at 37. The court finds this testimony reflects Turney's memory of what occurred, as well as his routine practice. Pirelli confirms the reference to seeking a warrant. A reference to a search warrant is also consistent with the parties conduct right after the request to search the bag was made. Pirelli did not attempt to leave. Instead, she asked if she could call her attorney.

pieces of luggage. *Id.* The dog alerted to Pirelli's bag, indicating the presence of narcotics. *Id.* The process of removing the bag and having it sniffed took less than five minutes. *Id.* at 24.

A search warrant was obtained, and the bag was searched. Inside the officers found plastic bags containing PCP. Transcript of April 21, 1986 Detention Hearing at 26. The PCP weighed over two hundred grams. *Id.* at 26–27; Report of Investigation, Exhibit 3 at Suppression Hearing.

While Turney was gone with the bag, an attorney, Joseph P. Hennelly, Jr., returned Pirelli's call. September 3, 1986 Tr. at 38–39. Report of Investigation, Suppression Exhibit 3. Pirelli told Hennelly that there were two police officers with her and they were insisting on searching her bag before allowing her to leave. October 3, 1986 Tr. at 70. Pirelli was nearly hysterical. *Id.* at 72. Hennelly asked her if they had a warrant, and she responded that they did not. *Id.* at 66. Hennelly then told her that under those circumstances she should not allow them to search the bag. *Id.* He asked to speak to the officers. *Id.* at 67.

Aguilar then took the telephone. *Id.* at 8, 67. Hennelly asked her what right she had to stop Pirelli. *Id.* at 67. Aguilar told him, "we received a telephone tip and information describing Ms. Pirelli as a person who was going to bring in illegal drugs." *Id.* at 67. Hennelly demanded that she release Pirelli and return her bag. *Id.* at 73. At that point Aguilar returned the telephone to Pirelli, who told Hennelly that Turney had taken the bag away. *Id.* at 67–68.

At the Detention Hearing, Aguilar testified that she had told the person who returned Pirelli's call that she had received a telephone tip concerning Pirelli. April 21, 1986 Tr. at 39. This accurately reflected what she told Hennelly. On September 3, 1986, Aguilar initially testified that she did not recall whether she said anything about a telephone tip during the Detention Hearing. September 3, 1986 Tr. at 65, 66. La-

ter in her testimony on September 3, Aguilar denied she had told Hennelly there was a tip and denied testifying at the Detention Hearing that she had told him of a tip. *Id.* at 72–73. On October 3, Aguilar admitted that on September 3 she knowingly testified falsely when she said she did not tell Hennelly about a tip. October 3, 1986 Tr. at 19. She stated that she had testified falsely on September 3 because she was reluctant to tell the court or anyone else that she had lied to Hennelly when she told him of a telephone tip. *Id.*

## II. CONCLUSIONS OF LAW

To decide this Motion to Suppress the court must determine (1) if the initial questioning of Pirelli was the type of consensual encounter that does not implicate the Fourth Amendment; if so, (2) when the initial consensual encounter became a detention; and (3) whether there was at that point reasonable, articulable suspicion to justify the detention. The court concludes that the initial encounter was voluntary; it became a detention when the officers told Pirelli they would attempt to get a search warrant if she did not allow them to search the bag; and the officers did not then have the reasonable, articulable suspicion necessary to permit a detention. The evidence subsequently discovered, therefore, must be suppressed.

### A. *The Initial Questioning and Subsequent Detention*

The initial questioning of Pirelli was the type of consensual encounter that does not implicate the Fourth Amendment.[2] *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984). The Supreme Court recently stated that:

[L]aw enforcement officers do not violate [or implicate] the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if

---

**2.** The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions ... Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States v. Mendenhall,* 446 U.S. 544, 555 [100 S.Ct. 1870, 1877, 64 L.Ed.2d 497] (1980) (opinion of Stewart, J.);

*Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (opinion of White, J.) *See also United States v. Viegas,* 639 F.2d 42, 44 (1st Cir. 1981); *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348; *United States v. Berryman,* 717 F.2d 651, 661 (1st Cir.1983), (Breyer, J., dissenting), *rev'd per curiam,* 717 F.2d 650 (adopting dissenting opinion), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984).

"A person has been 'seized' within the meaning of the fourth amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion by Stewart, J.,). In *Mendenhall,* the Supreme Court provided examples of what might indicate a seizure even where, as here, the person did not attempt to leave. These included "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

■ In this case, the encounter began outside the terminal with the officers identifying themselves and asking Pirelli several questions concerning her identity. The officers were polite. They did not touch Pirelli. They did not block her path. At this point, even taking into account Pirelli's young age and limited education, the encounter was voluntary. *Mendenhall* 446 U.S. at 558, 100 S.Ct. at 1879.

■ When Turney asked Pirelli for consent to search her bag, he told her that she had a right not to consent to such a search, but that an attempt would be made to get a search warrant if she did not consent. At this point the voluntary encounter became a detention.

If this case involved only a request to search Pirelli's bag, the request would not have converted the voluntary encounter to a detention. *See Mendenhall,* 446 U.S. at 548, 100 S.Ct. at 1873; *United States v. Jodoin,* 672 F.2d 232, 234 (1st Cir.1982). However, Pirelli was also told that if she did not consent to the search, the officers would attempt to get a search warrant. As has been found in similar circumstances, "when the agent informed [Pirelli] that if consent was not forthcoming he would attempt to secure a search warrant, there was a clear implication that [she] would be retained in custody until the warrant was obtained." *United States v. Ocheltree,* 622 F.2d 992, 994 (9th Cir.1980).[3]

■ In *Ocheltree,* an airline passenger was stopped as he left the airport. He "voluntarily accompanied the [DEA] agent to his office and there was nothing to sug-

---

**3.** It is important to recognize that Pirelli would have been *improperly* detained while the officers sought to obtain a warrant, if they had actually followed through with their threat to do so. When a defendant is not improperly detained, courts have found it is not coercive to request to search the bag while advising the defendant if the request is denied a search warrant will be sought. *United States v. Fernandez,* 772 F.2d 495, 504 (9th Cir.1985); *United States v. Borys,* 766 F.2d 304, 314–15 (7th Cir.1985); *see also United States v. Culp,* 472 F.2d 459 (8th Cir.1973) In such cases the choice is "between consenting to a search of the suitcase or being

lawfully detained pending search of the suitcase pursuant to a warrant." *United States v. Fernandez,* 772 F.2d at 504. In such cases the choice presented is not between allowing the requested search and suffering an unlawful detention of either property or person. *Compare Fernandez,* 772 F.2d at 504. If the denial of the request to search would result in an unlawful detention—either because there was no right to detain or no right to prolong detention—for the purposes of obtaining a warrant, the encounter is no longer consensual. *See generally, United States v. Borys,* 766 F.2d at 314 (7th Cir.1985); *Ocheltree,* 622 F.2d at 994.

gest that the consent was coerced." *Id.* Nevertheless, the encounter lost its consensual character when the defendant was told that if he did not consent the agent would seek to get a search warrant because, "The only reasonable construction appellant could place on the agent's statement was that appellant would not be permitted to frustrate the agent's attempts by boarding his plane and thus placing himself beyond reach of the ... warrant." *Id.* Similarly, Pirelli's conduct demonstrated her understanding that if she did not want to grant the officer's request to search the bag she was not free to leave with her bag. If she had felt she was free to leave with her bag, the court finds she would have done so, rather than ask permission to call her lawyer. As indicated earlier, Pirelli's belief that she could not then leave with her bag was, when viewed in the totality of the circumstances, a reasonable belief.

■ Even if it is assumed that it would only have been reasonable for Pirelli to believe that Turney's reference to seeking a warrant meant that she was free to go, but would have to leave her bag, a detention requiring reasonable articulable suspicion had occurred. *United States v. Place,* 462 U.S. 696, 708–709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1982) ("[W]hen the police seize luggage from the suspect's custody, we think the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause."); *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1983). In *Jacobsen,* the Supreme Court found that, "A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property." 466 U.S. at 113, 104 S.Ct. at 1656. In this case, it was, at a minimum, reasonable for Pirelli to believe, as she did, that Turney's reference to seeking a warrant meant that if she

wanted to go she would have to leave her luggage with the officers. In *Place,* the Supreme Court decided to "apply the principles of *Terry v. Ohio* [392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ] ... to permit such seizures [of property only] on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime." *Place,* 462 U.S. at 702, 103 S.Ct. at 2642.[4]

Thus, because Pirelli had a reasonable belief that she or her bag were not free to leave when Turney said he would seek a warrant, a detention requiring reasonable articulable suspicion then occurred. Indeed, on October 3, the government acknowledged that a detention occurred when Turney said he would attempt to get a warrant. October 3, 1986 Tr. at 92. The government contends that the officers then had reasonable, articulable suspicion that Pirelli was engaged in criminal activity. As explained below, the court finds they did not.

As the court has found that Pirelli was detained prior to reentering the terminal regardless of whether a tip was mentioned, it is not necessary to decide the vexing issue of whether the agents told her outside the terminal that they had received a telephone tip which aroused their suspicions concerning her. It is possible that Pirelli, who claims she was then told of a tip, confused what she heard Aguilar tell Hennelly on the telephone with what she was told initially. It is also possible that her testimony was contrived. In view of Aguilar's statement to Hennelly and subsequent false testimony concerning it, there is also a meaningful possibility that both Aguilar and Turney testified falsely when they denied telling Pirelli of a tip. As the proceedings to date have been inadequate to permit the court to decide which version of the testimony concerning the tip is cor-

---

**4.** This case may seem factually similar to *United States v. Regan,* 687 F.2d 531 (1st Cir.1982) in which the Court of Appeals for the First Circuit made a distinction between detention of a person and detention of a person's luggage. *Regan,* however, was decided before *Place* and *Jacobsen* established that the same justification is required for detention of an individual and detention of an individual's luggage.

rect, and it is not essential to do so to resolve the Motion to Suppress, the court makes no finding on the issue.[5]

The court notes, however, that if the officers did claim that they had a tip suggesting Pirelli was carrying drugs, this fact would reinforce the conclusion that she was detained while outside the terminal. *United States v. Freymuller*, 571 F.Supp. 61, 65 (N.D.Ill., 1983); ("[t]urning the matter over in ... the mind of any reasonable person, it would seem unlikely that the officers would let him simply walk off if indeed he met the description of a person carrying narcotics ... it is difficult to see how [the defendant] could reasonably have thought he was free to leave."); *United States v. Berry*, 670 F.2d 583, 597 (5th Cir.1982) ("Also, we must properly weigh the effect of statements by officers that individuals are suspected of smuggling drugs."); *Borys*, 766 F.2d 304 (7th Cir.1985)[6]

### B. *Reasonable and Articulable Suspicion*

■ As indicated earlier, the government did not have justification for its detention of Pirelli outside the terminal. A law enforcement officer may temporarily seize or detain a person if after assessing the totality of the circumstances he has developed a "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity."

*Place*, 462 U.S. at 702, 103 S.Ct. at 2642 (citing *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880). However, more than an "inchoate and unparticularized suspicion or hunch is required." *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1979). Rather, the government must identify "specific and articulable facts" to justify the detention. *Place*, 462 U.S. at 703, 103 S.Ct. at 2642. The government has failed to do so in this case.

■ Aguilar was the first to suspect Pirelli. Initially, she had only what she called a "hunch" concerning Pirelli. Her hunch was based solely on what Aguilar characterized as her "sixth sense." The only possible fact which Aguilar identified as a basis for her hunch was that Pirelli "acted nervously. She was asking the other passengers questions." September 3, 1986 Tr. at 75. Turney said Aguilar told him to watch Pirelli, because "she was looking around and walking real slow." *Id.* at 8. Pirelli, however, testified that she did not know where the baggage claim was and she had to ask for directions. Her conduct was consistent with this innocent explanation.

Turney first saw Pirelli as she approached the baggage claim area. Her clothing and appearance—old blue jeans, oily hair that had not been combed, yellow high heeled shoes, no jewelry, no makeup—made him suspicious. Turney also no-

---

**5.** The court believes that if it were necessary to decide whether Pirelli was told of a tip in order to decide the Motion to Suppress, a further hearing focused on this question would be adequate to resolve this issue.

**6.** The law in the First Circuit concerning the effect of a claim of a tip is difficult to discern because of the en banc reversal of the decision in *United States v. Berryman*, 717 F.2d 650 (1st Cir.1983) (en banc). In *Berryman*, a panel of the First Circuit initially found, "A reasonable person would not feel free to walk away when after answering truthfully where he had been and for how long, and proffering his airline ticket whose information is confirmed by other identification, he is questioned further and confronted with the suspicion of drug trafficking." *Berryman*, 717 F.2d at 656. Upon rehearing, the First Circuit *en banc*, concluded, however, "Af-

ter reviewing the record in this case and the panel's opinions, we conclude that the district court's judgment should be affirmed for the reasons set forth in the panel's dissent. This conclusion rests primarily upon our having found that Berryman's decisions to answer the DEA agents questions and to allow them to look through his bag were voluntary. Berryman, of course, could have refused to speak with the agents." *Id* at 651.

In *United States v. Manchester*, 711 F.2d 458 (1st Cir.1983), which was decided after the original panel decision but before the en banc reversal, the First Circuit found "that the question of whether Manchester's person was seized for the purposes of the Fourth Amendment is controlled by our recent decision in *Berryman*. The First Circuit panel then quoted the relevant passage from the original *Berryman* decision.

ticed that Pirelli shifted back and forth in either frustration or nervousness as she waited fifteen minutes for her luggage to appear. Turney observed that her checked luggage consisted of one light bag. When the bag arrived, Turney saw Pirelli move quickly out the exit.

At this point, there was no reasonable and articulable suspicion to detain Pirelli or her bag. The circumstances identified above "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures ..." if nothing further was required. *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Although agents "may be able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer," *United States v. Mendenhall*, 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1979) (opinion of Powell, J.); *United States v. Jodoin*, 672 F.2d 232, 235 (1st Cir.1982), the foregoing facts do not support more than "an inchoate and unparticularized suspicion." *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754.[7]

Thus, at the time they confronted Pirelli, Turney and Aguilar did not have the reasonable, articulable suspicion necessary to detain her. As explained earlier, however, the initial questions by the officers, which Pirelli voluntarily answered, did not constitute a detention. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1323. The responses to those questions could have, as a matter of law, contributed to the development of reasonable, articulable suspicion. *Berryman*, 717 F.2d at 633 ("By the time Berryman had answered a very few questions, there was ample ground for reasonable suspicion.") In this case, however, Pirelli's actions and answers prior to being detained—when told that Turney would seek a warrant if she did not consent to a search of her bag—did not furnish the officers with the additional information necessary to provide the reasonable suspicion required to justify that detention.

In their initial questioning of Pirelli, the officers learned that her name was Kim Pirelli, she had no identification, she was nineteen years old, she lived in South Boston, and she had arrived from New York.[8] The officers had no reason to believe that the answers to these questions were not truthful. *Compare Jodoin*, 672 F.2d at 235 (Jodoin had "told the agents in Boston two highly relevant lies about himself [that

---

7. The Supreme Court's decision in *Reid* is particularly instructive on this point because the facts are similar to those in this case, if not more suspicious. In *Reid*, "(1) the petitioner had arrived from Fort Lauderdale, which the agent testified is a principal place of origin of cocaine sold elsewhere in the country, (2) the petitioner arrived in the early morning when law enforcement is diminished, (3) he and his companion appeared to the agent to be trying to conceal the fact that they were traveling together, and (4) they apparently had no luggage other than their shoulder bags." *Id.* 448 U.S. at 441, 100 S.Ct. at 2754. The Supreme Court concluded that these factors were insufficient to constitute reasonable, articulable suspicion. The only factor that seriously concerned the Supreme Court was the officer's perception that the two were trying to conceal the fact they were traveling together. The other factors described "a very large category of presumably innocent travelers." *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. The officers in the instant case did not contend Pirelli was trying to conceal that she was traveling with someone else. Their suspicions were based on Pirelli's arrival from New York, her appearance, and her one light bag.

Little or no luggage and arrival from a source city are characteristics that have been found to fit a drug courier profile, "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." *Id.* at 440, 100 S.Ct. at 2754; *See United States v. Berry*, 670 F.2d 583, 599 (5th Cir.1982). The Supreme Court did not, however, give much weight to these characteristics. *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. Moreover, Pirelli did not display other qualities which have been found to be characteristics of drug couriers. There is no indication that Pirelli paid for her ticket in cash, *Royer*, 460 U.S. at 493, 103 S.Ct. at 1321; *Berryman*, 717 F.2d at 663; *Jodoin*, 672 F.2d at 233; that she had an unusually short stay before her return trip, *Berryman*, 717 F.2d at 663; *Jodoin*, 672 F.2d at 233 or that she used an alias. *Berry*, 670 F.2d at 599.

8. The officers did not learn Pirelli had no money until after they had requested to search her bag and she asked to call her attorney. Turney did not smell the ether until they returned to the terminal. Facts learned after the detention cannot be used to justify the detention. *See Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917 (1968).

they knew to be lies] and made a series of statements about the suitcase that the agents knew were false or at least unusual."). Indeed Pirelli's responses to each of the officers' questions were truthful.

Pirelli's lack of identification is a factor which would tend to contribute to possible reasonable suspicion. Few travelers are without identification and, as Turney testified, traveling without identification facilitates concealment of an individual's true identity. Pirelli's youth, however, diminishes the significance of her lack of identification.

Pirelli's youth also diminishes the significance of her being a "little nervous" when confronted by the officers. October 3, 1986 Tr. at 53. A nineteen year old stopped by two police officers who state they are conducting a narcotics investigation could be expected to be "a little nervous" when the officers question her.

The court finds that the foregoing facts do not cumulatively constitute the reasonable, articulable suspicion necessary to justify the detention of Pirelli or her bag. Rather, once again, these characteristics apply to many "presumably innocent travelers who would be subject to virtually random seizures" *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754, if nothing further was required to justify a detention. Only an "inchoate and unparticularized suspicion" could be formulated from the facts. *Id.* at 441, 100 S.Ct. at 2754. Indeed, Turney himself acknowledged this. He testified

that prior to the time he returned to the terminal with Pirelli and smelled the ether he was unsure of whether to detain Pirelli or her bag. As he put it:

> [A]t that point I was very curious but had not made a determination if I was going to ... detain the bag or not.... When I smelled ether odor emanating from the bag I was certain I was going to detain the bag. Up to that point I was wavering. My *gut instinct* [before reentering the terminal] was something was going on but I didn't really have my mind made up as to what it could be.

September 3, 1986 Tr. at 44 (Emphasis added). Neither Aguilar's "hunch" nor Turney's "gut instinct" constituted the reasonable, articulable suspicion necessary to justify the detention which occurred outside the terminal.

## III. AGUILAR'S FALSE TESTIMONY

On September 3, 1986, defendant's counsel questioned Aguilar concerning whether, as Pirelli and Attorney Hennelly contended, she had told Hennelly that the officers had received a telephone tip which aroused their suspicions concerning Pirelli. September 3, 1986 Tr. at 72–73. Pirelli denied saying this to Hennelly on the telephone.[9]

On September 3, Aguilar also denied testifying at Pirelli's arraignment, with regard to the question of pre-trial detention, that she had told Hennelly there was a telephone tip.[10]

9. Now, referring to that section [of Hennelly's Affidavit dated July 16, 1986] in regard, to, "I immediately"—meaning Henelly—"told my client to put one of the officers on the phone. The officer, female, explained they had taken her bag for inspection because they had received a phone call stating a young female fitting Kim Pirelli's description was arriving at Logan that afternoon and would be carrying a quantity of drugs."
   THE WITNESS: I remember advising Mr. Hennelly that we took the bag for—that my partner took the bag to present it to one of the troopers, and that was explained to Miss Pirelli—what we were going to do.
   Q. Do you have a memory of having stated that? Is it your testimony you didn't say that to Mr. Hennelly?
   THE COURT: Say what?

MR. HARRINGTON: Say those statements we just referred to—that she was under suspicion because of a phone tip received.
   THE WITNESS: Not because of a phone tip.
   Q. All right. Now, you didn't say that?
   A. No.
   Q. You deny that you made the statements contained in here in regard to why you stopped Miss Pirelli—that you made those statements to Mr. Hennelly?
   A. Yes.

10. Q. Do you deny you made—that you did not make those statements during the arraignment—that you stopped her because of a phone tip?
   A. Yes.

The dispute concerning whether Aguilar told Hennelly there was a tip was relevant to the credibility of the officers' claim that they had not told Pirelli, outside the terminal, that they had received a tip. This issue was relevant to the question of whether Pirelli or her bag were detained outside the terminal, although the court has not found it necessary to resolve the dispute concerning the tip in order to decide whether a detention occurred. The government and defense counsel agreed that the court and counsel should consider Aguilar's testimony at the Detention Hearing as part of the record of the Suppression Hearing. *Id.* at 87, 104.

The court's review of Aguilar's April 21, 1986 testimony indicated that she had then testified that she told Hennelly that the officers had received a telephone tip regarding a young female which aroused their suspicion concerning Pirelli. April 21, 1986 Tr. at 39.[11] As the court informed counsel on September 12, 1986, the discrepancy in Aguilar's testimony raised several issues. These issues included whether Aguilar's September 3 testimony was innocently mistaken or knowingly false; the credibility of Aguilar's and Turney's testimony that Pirelli was not told of a tip outside the terminal; and whether, if Aguilar's testimony was knowingly false, it was part of a demonstrated pattern of government misconduct which might require dismissal of the case. September 13, 1986 Tr. 6–11.

On October 3, 1986, upon questioning by the government, Aguilar testified that she had indeed told Hennelly that there was a tip, but that this was a misstatement on her part. October 3, 1986 Tr. at 8–9.[12] Aguilar also stated that when she testified on September 3, 1986 that she had not told Hennelly of a tip, she knew her testimony was not true, but she was reluctant to tell the court or anyone else that she had lied during her conversation with Hennelly.[13] October 3, 1986 Tr. at 19.

On October 3, 1986, Aguilar and Turney continued to insist that neither of them told Pirelli, outside the terminal, that they had received a telephone tip which influenced their interest in her. October 3, 1986 Tr. at 7, 29, 30.

The court has considered whether this case should be dismissed because of Aguilar's false testimony. The court has concluded that dismissal is unwarranted, but further action with regard to Aguilar should be considered.

■ Ordinarily where there is not continuing prejudice that cannot be remedied

11. Q. And did you state that you had gotten a telephone call identifying, describing this young lady coming through?
A. Not fully describing, but a young female.
Q. So did you receive a telephone call.
A. We had some information, yeah.
Q. You had information.
A. From a phone call.

12. Q. And would you tell the Court what you said and what Attorney Hennelly said during the conversation?
A. I spoke to Mr. Hennelly and he advised me that I had no right to stop his client. I advised Mr. Hennelly we were conducting a narcotics investigation, that we had a tip that someone that fit his client's description, and that is why we were questioning her.
Q. So you told Attorney Hennelly that you had a tip that Ms. Pirelli or someone fitting her description would be carrying controlled substances at the airport, is that correct?
A. That is correct.
Q. And that statement to Attorney Hennelly, Agent Aguilar was not true, correct?
A. That is correct.

Q. And would you explain to the Court why you made a false statement to Attorney Hennelly during the conversation?
A. It was a misstatement on my part. I was in a panic and Attorney Hennelly was yelling at me, telling me that I had no right to stop his client; that we had to obtain a search warrant; that we had no probable cause to question his client.

13. Q. Now, Agent Aguilar, also you testified on September 3rd, as indicated on Page 73, at Lines 12 through 15, that you did not make these statements to Mr. Hennelly. You knew at the time that those statements were not true, correct?
A. That is correct.
Q. And at that time, Ms. Aguilar, you were reluctant to tell the Court or anyone else for that matter that you had lied during your conversation with Mr. Hennelly, isn't that true?
A. That is correct.

by suppression of evidence or a new trial, dismissal of an indictment is inappropriate, even if the government misconduct is deliberate. *United States v. Morrison,* 449 U.S. 361, 365–366, 101 S.Ct. 665, 668–669, 66 L.Ed.2d 564; *United States v. Kelly,* 543 F.Supp. 1303, 1313 (D.Mass.1982). In this case there will be no continuing injury to Pirelli from Aguilar's false testimony regarding what the agent said to Hennelly. *Compare United States v. Pollock,* 417 F.Supp. 1332, 1348 (D.Mass.1976). Indeed, as Aguilar is unlikely to repeat her false testimony, suppression of it is, as a practical matter, unnecessary. Usually, if suppression of the testimony or a new trial is not required, the more drastic remedy of dismissal is not appropriate. *Morrison,* 449 U.S. at 366, fn. 2, 101 S.Ct. at 668, fn. 2.

Dismissal might, however, be appropriate if the record revealed "a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness." *Id.* On September 12, 1986, the court asked counsel for the defendant and counsel for the government to search for, and bring to the court's attention, cases in this district involving knowingly false testimony by government agents. September 12, 1986 Tr. at 9. Neither party, however, has discovered misconduct it claims to be comparable to Aguilar's in this case. Thus, there is no record of recurring violations which might justify dismissal of this case in order to deter future government misconduct. *Id.*

The court, however, remains concerned about Aguilar's false testimony. That testimony was not corrected until the court pointed out the discrepancies between Aguilar's testimony at the Detention Hearing and her testimony at the Suppression Hearing and ordered that Aguilar testify again. Aguilar's false testimony delayed the disposition of the Motion to Suppress of a pregnant defendant. It also complicated the task of assessing Aguilar's credibility and that of Turney.

The court has the authority to address criminal contempt occurring in the presence of the court. F.R.Crim.P. 42(a). False testimony may in some circumstances constitute contempt, but it is questionable whether this is such a case. *Bloom v. Illinois,* 391 U.S. 194, 209–210, 88 S.Ct. 1477, 1486–1487, 20 L.Ed.2d 522 (1967); *In Re Michael,* 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945); *Ex Parte Hudgings,* 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1918); *United States v. Appel,* 211 F. 495, 496 (2d Cir.1913). The court would like, however, to make an informed judgment on this issue. Thus, the government is directed to file a memorandum addressing this as a question of law and providing any facts it may deem appropriate to disclose concerning the response of the Department of Justice and/or DEA to the matter of Aguilar's false testimony. Counsel for the defendant may, if he wishes, also file a memorandum addressing this issue.

## CONCLUSION

In view of the foregoing, it is hereby ORDERED that:

1. All evidence derived directly or indirectly from the search of defendant Pirelli's bag is hereby suppressed;

2. The government shall inform the court by November 18, 1986 whether it intends to go to trial in this case;

3. The government file the requested memorandum concerning Aguilar's false testimony by December 5, 1986. If counsel for the defendant wishes to file a memorandum on this issue, he shall do so by December 5, 1986.

## SUPPLEMENTAL MEMORANDUM AND ORDER

As discussed in this court's Memorandum and Order of November 13, 1986, the court has been concerned about the false testimony of Drug Enforcement Administration ("DEA") Agent Guadalupe Aguilar given in connection with Defendant's Motion to Suppress, but has doubted whether that false testimony could properly be ad-

dressed as possible criminal contempt under F.R.Crim.P. 42(a). Thus, the United States was ordered to present its views on this issue and to inform the court of the response, if any, of the Department of Justice and/or DEA to the discovery of Aguilar's false testimony. On November 26, 1986, the court was informed that the issues presented by the court's order have been submitted to the Public Integrity Section of the Criminal Division of the Department of Justice.

As indicated on November 13, 1986, because Aguilar's false testimony was not the functional equivalent of a refusal to respond to questions, it does not appear that it would be appropriate to address it as presenting an issue of criminal contempt. *In Re Michael*, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945); *Ex Parte Hudgings*, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1918); *United States v. Appel*, 211 F. 495, 496 (2d Cir.1913). *See also Bloom v. Illinois*, 391 U.S. 194, 209–210, 88 S.Ct. 1477, 1486–1487, 20 L.Ed.2d 522 (1967). As the issues raised by Aguilar's false testimony are now being considered by the Criminal Division of the Department of Justice, the court is satisfied that appropriate means are being employed to address this serious matter.

In view of the foregoing, the court has determined that it is unnecessary and inappropriate for the court to pursue the matter of Aguilar's false testimony was a possible case of criminal contempt. Therefore, no further filings concerning Aguilar's false testimony are required.